**Homi N. AMIRMOKRI,
Plaintiff–Appellant,**

v.

**BALTIMORE GAS AND ELECTRIC
COMPANY, Defendant–Appellee.**

No. 94–2529.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1995.

Decided Aug. 3, 1995.

**ARGUED:** Lawrence Edward Dube, Jr., Dube & Goodgal, P.C., Baltimore, MD, for appellant. Luther Ellis Justis, Jr., Baltimore, MD, for appellee.

Before ERVIN, Chief Judge, and MURNAGHAN and MICHAEL, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Chief Judge ERVIN and Judge MURNAGHAN joined.

## OPINION

MICHAEL, Circuit Judge:

Homi Amirmokri appeals the district court's grant of summary judgment in favor of Baltimore Gas and Electric Co. (BG & E) on his Title VII claims stemming from alleged mistreatment due to his Iranian national origin. Amirmokri asserts three claims: discriminatory failure to promote, harassment, and constructive discharge. We affirm summary judgment for BG & E on the claim of failure to promote. However, because genuine issues of material fact exist regarding Amirmokri's constructive discharge claim and because equitable relief may be available to him ultimately on his harassment claim, we reverse the district court's grant of summary judgment on these two claims and remand for further proceedings.

### I.

Amirmokri, an Iranian immigrant, interviewed for an engineering position with BG & E in August 1989. During his interview he told BG & E that he was interested in a Senior Engineer position. In October 1989 Amirmokri accepted BG & E's offer for an Engineer position at the Calvert Cliffs nuclear power plant. He says he understood that he would be promoted to Senior Engineer within six months.

Amirmokri alleges the following sequence of events. At the end of March 1990 a Senior Engineer position opened up at Calvert Cliffs. Douglas Lenker, another BG & E employee, was chosen to fill the slot. Amirmokri believed that this was the position he had been promised at the time of his offer and sought an explanation from his supervisors. He first met with Al Thornton, the General Supervisor, in April 1990 to discuss the unrealized promotion. The following month he met with Larry Tucker, who had replaced Thornton as the General Supervisor, about the promotion issue and the way he was being treated by Michael Polak, his engineering work group leader. Tucker, who was new, told Amirmokri that he didn't know anything about the situation but said he would talk to Polak.

Around the time of Amirmokri's meetings with Thornton and Tucker, Polak began to harass Amirmokri by making derogatory references to his Iranian national origin, calling him "the local terrorist," a "camel jockey," "the ayatollah," and "the Emir of Waldorf" (Amirmokri lived in Waldorf, Maryland). Polak encouraged others to do the same thing. He also intentionally embarrassed Amirmokri in front of other employees by saying Amirmokri did not know what he was talking about. Finally, Polak withheld company benefits, like meal money, from Amirmokri.

By late July 1990 the harassment had not ceased. Frustrated, Amirmokri complained to Charlie Cruse, the Department Manager, who arranged for Amirmokri to meet with Bill Dunson, the Employee Grievance Coordinator, in August. Dunson told Amirmokri that he would investigate and get back to him. Dunson claims that he spoke to Polak and several of Polak's superiors, none of whom provided support for Amirmokri's allegations. In September 1990 Amirmokri began to suffer from severe gastric pain. His doctor told him that he was developing an ulcer caused by work-related stress and that he should quit his job if the harassment and stress did not end. By October Amirmokri had not heard back from Dunson, and he went to George Creel, a Vice President of BG & E. Amirmokri requested a transfer to a different job so he would not have to report to Polak. Creel told him he would investigate and get back to him. Creel also arranged for Amirmokri to see BG & E's clinical psychologist.

After his meeting with Creel, Amirmokri received his interim performance appraisal prepared by Polak. The appraisal rated his performance as a "C," meaning "performance and results less than what is normally expected." A few days later, he was summoned to see Peter Katz, the General Superintendent. Katz told Amirmokri that he had spoken with Dunson, that he (Katz) was told that no discrimination had occurred, and that he did not intend to discuss that subject any more. Katz also offered to set up a meeting between Polak and Amirmokri to discuss Amirmokri's performance appraisal. Amir-

mokri said he did not want to discuss his performance unless the discrimination issue could be discussed as well.

By November 1990 Amirmokri felt his situation was hopeless, so he resigned. Shortly thereafter he filed complaints with the Equal Employment Opportunity Commission (EEOC) and the Maryland Commission on Human Relations. In September 1992 the EEOC issued a determination that Title VII had not been violated. Amirmokri then sued BG & E in federal court, asserting three claims: (1) discriminatory failure to promote, (2) harassment based on national origin, and (3) constructive discharge. The district court first held that because the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071, was not retroactive, Amirmokri could not seek compensatory and punitive damages and had no right to a jury trial. The court then granted BG & E's motion for summary judgment on all three claims. On the failure to promote claim, the court determined that Amirmokri failed to show that BG & E's alleged reason for promoting Lenker was merely pretext. On the harassment claim, the court held that while Amirmokri had made out a prima facie showing of harassment, no equitable relief was available to him. On the constructive discharge claim, the court found that Amirmokri had failed to produce sufficient evidence that BG & E intended to force him to quit. Amirmokri now appeals, and we consider each of his three claims in turn.

II.

A. *Failure to promote*

To prove a prima facie case of discriminatory failure to promote under Title VII, a plaintiff must prove that: (1) he is a member of a protected group, (2) he applied for the position in question, (3) he was qualified for the position, and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994). An employer may rebut a plaintiff's prima facie case by demonstrating that the person promoted was better qualified for the position. The plaintiff then may attempt to prove that the employer's articulated reason for promoting the successful applicant

was merely pretext. The plaintiff bears the final burden of persuasion on the issue of intentional discrimination. *Id.*

■ The district court found that Amirmokri made out a prima facie case of discriminatory failure to promote, and we agree. Amirmokri is of Iranian national origin, placing him in a protected class. He produced evidence that he applied for, and was qualified for, the Senior Engineer position to which Lenker was ultimately promoted. Finally, the fact that the person selected (Lenker) was not of foreign origin gives rise to an inference of unlawful discrimination. *Id.* (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 186–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989)).

■ However, the district court also found that (1) BG & E produced evidence that Lenker was better qualified for the Senior Engineer position and (2) Amirmokri failed to rebut this with evidence showing BG & E's asserted reason for promoting Lenker was merely pretext. Again, we agree with both of these determinations. BG & E claimed it promoted Lenker because he had hands-on experience as an engineer operating a nuclear submarine and had worked at Calvert Cliffs for two and one-half years with outstanding performance ratings. Amirmokri, on the other hand, had worked at Calvert Cliffs for only three months with mediocre performance ratings.

Amirmokri claims that BG & E's asserted rationale is pretextual for four reasons. First, he claims that when BG & E hired him, it told him that he *would* be promoted to Senior Engineer within six months. Second, he asserts he was more qualified than Lenker because of his mechanical engineering degree and outside experience. Third, he maintains that BG & E improperly relied on subjective criteria in making the promotion decision. Finally, he claims that Polak, his alleged harasser, had substantial input into the promotion decision.

Each of these claims fails. Even assuming that Amirmokri was told when he was hired that he would be promoted, this does not itself give rise to an inference that the decision to promote Lenker was based on Amir-

mokri's national origin. BG & E was aware of Amirmokri's Iranian descent just five months earlier when it hired him and allegedly promised him a promotion, making it especially unlikely that he was denied a promotion because of bias against his national origin. *See Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992); *Proud v. Stone,* 945 F.2d 796, 797–98 (4th Cir.1991). Furthermore, Amirmokri failed to show he was more qualified than Lenker for the Senior Engineer position. Even if his education and outside experience were objectively superior to Lenker's, BG & E could properly take into account both the objective factor of Lenker's outstanding performance at Calvert Cliffs and the more subjective factors like his good interpersonal skills and his ability to lead a team. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258–59, 101 S.Ct. 1089, 1096–97, 67 L.Ed.2d 207 (1981); *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir.1989). Finally, although Polak had some input into the promotion decision, the decision was ultimately made by Thornton, and Polak's harassment of Amirmokri did not begin until after Lenker's promotion. We therefore affirm summary judgment on Amirmokri's claim for failure to promote.

### B. *National origin harassment*

■ To make out a claim of national origin harassment, Amirmokri must show (1) that the acts of BG & E employees were severe and pervasive enough to create a hostile working environment and (2) that some basis exists to impute liability to his employer. *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.1989), *vacated in part on other grounds,* 900 F.2d 27 (4th Cir.1990) (en banc) (adopting panel dissenting opinion); *Dwyer v. Smith,* 867 F.2d 184, 187 (4th Cir.1989). Liability may be imputed to the employer if the employer had actual or constructive knowledge of the existence of a hostile working environment and took no prompt and adequate remedial action. *Paroline,* 879 F.2d at 106; *Dwyer,* 867 F.2d at 184.

■ Whether harassment is sufficiently severe or pervasive to create an abusive work environment is "quintessentially a

question of fact." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir.1994); *Paroline*, 879 F.2d at 105. To show that harassment was severe or pervasive, a plaintiff must show that he perceived, and a reasonable person would perceive, the work environment to be abusive. *Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

 The district court found that Amirmokri produced sufficient evidence to show that harassment occurred and that it was severe and pervasive. He testified that for six months Polak and other co-workers abused him almost daily, calling him names like "the local terrorist," a "camel jockey" and "the Emir of Waldorf." He also asserted that Polak intentionally tried to embarrass him by giving him impossible tasks and by saying in front of co-workers that Amirmokri did not know what he was doing. He testified that this abuse led to his ulcer and his ultimate resignation. A reasonable person could easily find this atmosphere to be hostile. *See Boutros v. Canton Regional Transit Auth.,* 997 F.2d 198, 203–04 (6th Cir.1993).

 BG & E may be liable for Polak's harassment if it knew or should have known of the harassment and failed to take "prompt remedial action reasonably calculated to end the harassment." *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983). The adequacy of BG & E's response once it was aware of the harassment is a factual issue. *Paroline*, 879 F.2d at 106. In *Paroline*, a Unisys employee was sexually harassed by a co-worker. When she complained, Unisys launched a formal investigation, disciplined the harasser, and required him to seek counseling. The harasser was informed that any further incidents would be grounds for his immediate termination. We held that a reasonable factfinder could infer that Unisys intended the repri-

mand to be no more than a slap on the wrist and, therefore, a genuine issue of fact existed about whether Unisys's action was reasonably calculated to end the harassment. *Id.* at 107.

Here, BG & E's response was even less decisive than that in *Paroline*. To begin with, it is not clear whether anyone at BG & E ever investigated Amirmokri's complaint, even after Amirmokri complained to Dunson, the Employee Grievance Coordinator, in August 1990. Dunson claims that he spoke to Polak and several other members of the Calvert Cliffs supervisory staff, Richard Honaker (Employment Recruiter), Thornton, Creel (a company Vice President), and a Mr. Denton. However, Polak testified that he never heard about Amirmokri's allegations until after Amirmokri resigned and filed his EEOC complaint. Thornton also denied speaking to Dunson until after the complaint was filed and said he had no recollection of Dunson investigating the matter. Amirmokri testified that Dunson (who knew about Amirmokri's complaints in August 1990) did not get back to him until after he complained to Creel in October 1990. Creel testified that he first spoke to Dunson after his October meeting with Amirmokri, when he asked Dunson to review Amirmokri's allegations. Thus, the evidence is inconsistent regarding when (if at all) Dunson investigated Amirmokri's allegations, and thus whether BG & E's remedial action was prompt.[1]

Even if Dunson had investigated promptly, a reasonable factfinder could find his superficial response inadequate. After speaking with Polak and other supervisors, Dunson did not pursue the matter further. He did not interview any members of Amirmokri's work group other than Polak, did not warn or reprimand Polak, did not counsel Polak, and did not grant Amirmokri's request to be separated from Polak. This action falls far

---

1. There is some evidence that BG & E was aware of the harassment as early as Amirmokri's May 1990 meeting with Tucker. In his deposition, Amirmokri testified that Polak began to harass him shortly after his April 1990 meeting with Thornton. In his affidavit Amirmokri indicated that at his May meeting with Tucker, he complained about "the way in which Mr. Polak had been acting towards [him]" and that Tucker said

he would "talk to Mr. Polak regarding the unusual way th[at] Mr. Polak was treating" him. If Amirmokri did complain to Tucker in May 1990, BG & E had constructive knowledge of the harassment at that point. *See Katz*, 709 F.2d at 256. No evidence indicates that BG & E took prompt and adequate action (or indeed any action whatever) following Amirmokri's meeting with Tucker.

short of that taken by other employers in harassment cases. *Cf. Paroline,* 879 F.2d at 103–04 (formal investigation undertaken, perpetrator disciplined, given written warning and required to seek counseling); *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987) (harasser given written warning, told suspension would follow further misconduct, and monitored). We cannot say that the extent of Dunson's investigation and his failure to take further remedial action were, as a matter of law, reasonably calculated to end the harassment.

■ The district court, after holding that Amirmokri made out a prima facie case of national origin harassment, nonetheless dismissed his claim on the grounds that no equitable relief was available to him. In his complaint, Amirmokri requested compensatory and punitive damages, attorney fees and costs, and "[s]uch other and further relief as the Court may deem appropriate." We interpret the last item as a sufficient request for appropriate equitable relief. *See* 42 U.S.C. § 2000e–5(g)(1) (permitting "equitable relief as the court deems appropriate"). The district court concluded that because it had previously held that compensatory and punitive damages were unavailable,[2] and Amirmokri had articulated no other available relief, Amirmokri's claim must be dismissed.

■ The equitable relief ordinarily available in Title VII workplace harassment cases is an injunction prohibiting further harassment. *See* 42 U.S.C. § 2000e–5(g)(1); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975); *Spencer v. General Elec. Co.,* 894 F.2d 651, 660 (4th Cir.1990). The fact that Amirmokri made only a general request for equitable relief does not prevent him from being awarded an injunction. *See* Fed. R.Civ.P. 54(c); *Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 66, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978). However, because Amirmokri is no longer employed by BG & E, an injunction against future harassment

would be of no benefit to him unless he first obtains an injunction reinstating him at Calvert Cliffs. Thus, to obtain equitable relief on his harassment claim, he must prevail on his constructive discharge claim. If the district court had correctly dismissed Amirmokri's constructive discharge claim, its dismissal of the harassment claim also would have been correct. As we discuss below, however, the district court erred in granting summary judgment on the constructive discharge claim. If Amirmokri prevails on that claim, he may seek an injunction reinstating him at Calvert Cliffs, and hence he may be eligible for an injunction against further harassment. We therefore reverse the district court's grant of summary judgment on Amirmokri's national origin harassment claim.

## C. *Constructive discharge*

■ To prove constructive discharge, Amirmokri must show that BG & E deliberately made his working conditions "intolerable" in an effort to induce him to quit. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1353–54 (4th Cir.1995). He must prove two elements: (1) the "deliberateness of [BG & E's] actions" and (2) the "intolerability of the working conditions." *Id.* at 1354.

■ Amirmokri's testimony is sufficient to raise a factual issue about whether his working conditions were intolerable. He testified that Polak and other co-workers subjected him to epithets about his Iranian origin almost daily and tried to embarrass him in public. The constant stress created by this atmosphere caused him to get an ulcer and eventually to resign. A reasonable trier of fact could find these conditions intolerable. *See Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 677 (7th Cir.1993).

■ The more difficult question is whether Amirmokri has shown that BG & E deliberately attempted to force his resignation. Intent may be shown by evidence that an employee's resignation was the reasonably foreseeable consequence of the employer's

---

2. Compensatory and punitive damages were not authorized by Title VII prior to the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1076. All of the conduct that Amirmokri challenges occurred before the enactment of the 1991 Act, and the damages provision of the 1991 Act is not retroactive. *Landgraf v. USI Film Prods.,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

conduct. *Martin*, 48 F.3d at 1356. For example, intent may be inferred from a failure to act in the face of known intolerable conditions. *Paroline*, 879 F.2d at 114 (Wilkinson, J. dissenting). A complete failure to act by the employer is not required; an employer may not insulate itself entirely from liability by taking some token action in response to intolerable conditions. The reasonably foreseeable consequence of token action by the employer would still be that the employee resign. In other words, the employer's response must be reasonably calculated to end the intolerable working environment. *See Landgraf v. USI Film Prods.*, 968 F.2d 427, 430–31 (5th Cir.1992) ("A reasonable employee would not have felt compelled to resign immediately following the institution of measures which the district court found to be reasonably calculated to stop the harassment."), *cert. granted in part*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993), *and aff'd*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

To hold otherwise risks penalizing employees who suffer a constructive discharge rather than less severe forms of harassment. As discussed above, when an employee suffers from discriminatory treatment, claims for workplace harassment and constructive discharge are both governed by two-part tests. The first prong of each test weighs the severity of the conditions the employee faces. For a harassment claim the conduct must be "severe and pervasive," whereas for a constructive discharge claim the environment must be "intolerable." The second prong examines the employer's response. For a harassment claim the employer must fail to take "prompt and adequate" remedial action, and for a constructive discharge claim the employer must intend for the employee to quit.

To hold that any response by an employer, however superficial, negates any inference of intent in a constructive discharge claim might paradoxically deny relief to employees who suffer from the "intolerable" conditions necessary for constructive discharge rather than less severe conditions that might give rise to an ordinary workplace harassment claim. Suppose, for example, that an employee suffers workplace harassment on account of his national origin and his employer responds with token action that does not sincerely address the problem. If the harassment is severe and pervasive, the employee can bring a workplace harassment claim and obtain relief. If, however, the environment became intolerable and the employee were forced to resign, he would be unable (in the face of a token response) to bring a constructive discharge claim and would therefore be without a remedy. Requiring a response reasonably calculated to end the intolerable environment avoids this inequitable result.

Requiring a reasonably calculated response by an employer is consistent with our holding in *Paroline*. The employer in *Paroline*, as discussed above, undertook a formal investigation, disciplined the wrongdoer, limited his contact with other female employees, required him to seek counseling, and gave the plaintiff two weeks off to recuperate. 879 F.2d at 114 (Wilkinson, J., dissenting). This action could properly be found reasonably calculated to end any intolerable conditions. As we have since noted, no evidence in *Paroline* indicated that it was reasonably foreseeable that the plaintiff would quit following this remedial action. *Martin*, 48 F.3d at 1357.

Here, BG & E argues that it demonstrated that it did not intend for Amirmokri to resign. It claims it investigated Amirmokri's allegations, referred him to a clinical psychologist to help him deal with his work-related stress, and offered to discuss his performance appraisal. It maintains that it was not required to discipline Polak or take any further action on the basis of Amirmokri's unsubstantiated allegations.

We think that a genuine factual issue exists regarding whether BG & E's actions were sufficient to negate any reasonable inference of intent. First, as discussed above, it is unclear when, if ever, Dunson investigated Amirmokri's claims following his meeting with Amirmokri (Polak and Thornton testified that they did not hear about Amirmokri's allegations until he filed the EEOC charge). Furthermore, even the investigation Dunson claims to have undertaken was

cursory and failed to end the harassment. It fell far short of the types of responses courts have held adequate in other constructive discharge cases. *See e.g., Paroline,* 879 F.2d at 114 (Wilkinson, J., dissenting); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 537 (7th Cir.1993) (employer let employee work at home during investigation, investigated promptly, transferred culprit, and took other steps reasonably likely to stop the harassment); *Landgraf,* 968 F.2d at 429 (employer gave wrongdoer written reprimand and transferred him to another department). Amirmokri testified that he complained to at least five members of the Calvert Cliffs' staff beginning in May 1990 and that he was ultimately forced to resign because BG & E took no effective action. We hold that Amirmokri has produced evidence sufficient to allow a reasonable factfinder to conclude that BG & E's response was not reasonably calculated to end Amirmokri's intolerable working conditions and that Amirmokri's ultimate resignation was a reasonably foreseeable consequence of BG & E's insufficient response. Therefore, we reverse the district court's grant of summary judgment on Amirmokri's constructive discharge claim.

### III.

For the above reasons, we affirm the grant of summary judgment on Amirmokri's claim for failure to promote and reverse the summary judgment on Amirmokri's claims for national origin harassment and constructive discharge. We remand to the district court for further proceedings consistent with this opinion.[3]

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

---

3. We have surveyed the evidence in the context of an appeal from the grant of BG & E's motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (on motion for summary judgment, evidence of nonmovant is to be believed, and all justifiable inferences must be drawn in his favor). Accordingly, we emphasize that we express no opinion on what the outcome of this case should be on remand.