**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARY JEAN VITELLO,
Plaintiff-Appellee,

v.

No. 96-1141

J.C. PENNEY COMPANY,
INCORPORATED,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Robert S. Carr, Magistrate Judge.
(CA-93-1177-2-22AJ)

Argued: January 29, 1997

Decided: March 3, 1997

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Nicholas A. O'Kelly, Personnel Relations Attorney, J.C.
PENNEY COMPANY, INC., Plano, Texas, for Appellant. Coming
Ball Gibbs, Jr., GIBBS & HOLMES, Charleston, South Carolina, for
Appellee. **ON BRIEF:** Robert S. Phifer, HAYNSWORTH, BALD-
WIN, JOHNSON & GREAVES, P.A., Charlotte, North Carolina, for
Appellant. Alan D. Toporek, URRICHIO, HOWE, KRELL, JACOB-
SON, TOPOREK, THEOS & JOHNSTON, P.A., Charleston, South
Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Mary Jean Vitello ("Vitello") worked for J.C. Penney Co., Inc. ("Penney") for sixteen years. In 1992, the fifty-four year old Vitello resigned; subsequently, she filed this action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-634 (West, WESTLAW through Nov. 11, 1996). At the conclusion of a multi-day trial, a jury found in Vitello's favor. Penney appeals. We affirm in most respects but remand for recalculation of damages.

I.

In 1976, six months after Vitello began working for Penney as a hairstylist, she was promoted to supervisor of the styling salon. She remained in that post during her remaining fifteen and a half years with Penney. As supervisor, Vitello still continued to be an active stylist and, over the years, built a large customer base of her own. In 1989, however, Penney redefined the supervisor's duties to focus less on styling and more on managerial responsibilities; Vitello's direct supervisor, Kenneth Woodruff, told her to concentrate on management and assign three-fourths of her clientele to other stylists, which she did.

Vitello generally received good reviews on her performance until March, 1991, when Woodruff complained to Vitello that she was not hiring new stylists, who were needed to generate greater sales volume in the salon. This continued to be Penney's principal complaint with Vitello for her remaining year with the company. But Vitello testified that in 1989 Penney had eliminated her hiring authority; at that time, Vitello was told to refer all applicants to the personnel administrator, Virginia Mobbs, who would interview them and make all hiring decisions. Numerous other Penney stylists confirmed that the hiring policy had changed and that Mobbs had assumed Vitello's role in hiring

2

stylists. Moreover, Vitello testified that when she reminded Woodruff that she no longer had hiring authority and asked him to instruct Mobbs to hire more stylists, he told her that "Virginia Mobbs knew what the J. C. Penney Company needed and for [Vitello] to leave it at that." The only other complaint that Penney advanced against Vitello was Woodruff's suggestion at trial that Vitello did not get along with the salon stylists. However, in previous evaluations, Woodruff had praised Vitello for her good working relations and stylists testified at trial that they were on good terms with Vitello and had no complaints as to her management style.

Beginning in the later part of 1991, Woodruff often made comments regarding Vitello's age and the age of her clientele. For instance, Woodruff frequently referred to Vitello as "grandma" and stated that the salon reminded him of an "old folks home." When she was on the escalator with another employee, Woodruff told her, "Jean, you better hold on, you know you're getting old, grandma." In September 1991, Woodruff called Vitello into his office, and told her that the salon's clientele was so old, it depressed him. He said that "he didn't want any more old people, and he wanted [her] to get young, cute stylists." On another occasion, Woodruff told Vitello her "clientele had some age on them" and "it was so depressing they were so old." At trial, Woodruff admitted telling Vitello that she needed to bring in a younger clientele but he denied making most of the other comments. However, several stylists confirmed Vitello's account, saying they had overheard Woodruff make such comments. Even a customer testified she had heard Woodruff say that "they needed young blood in there."

During this same period, members of Penney management also made several comments linking Vitello's age to her continued employment by the company. For instance, Alan Visconti, the store manager, asked her in October 1991, "don't you want to step down? Jean you're getting older. If you can't handle it, just step down." When Vitello asked him to get Virginia Mobbs to "hire the people I send up," Visconti replied, "Virginia Mobbs knows what this store needs" and again suggested to Vitello: "don't you want to step down? You know you're getting older." Woodruff admitted that he also asked Vitello "had she thought about stepping down?"

3

After a series of meetings at which Visconti and/or Woodruff criticized Vitello for the lack of salon sales and berated her as "grandma," they met with her on March 13, 1992 for three consecutive hours. They again informed Vitello of their negative appraisal of her work and put her on a ninety-day probation period. When criticized about the shortage of stylists, Vitello again asked Visconti to instruct Virginia Mobbs to hire the stylists that Vitello referred to Mobbs. Visconti again told her "that Virginia knows what the styling salon needs." He then urged her, "Jean, why don't you just give it up?" Vitello said she "was not a quitter" and refused to "give up." But she wept and was so distraught that after the meeting she had to seek immediate medical assistance.

During the ninety-day probation period, Penney required Vitello to meet with Woodruff or Visconti every day. At meetings with Woodruff, he continued to call her "grandma" and to ask her, "why don't you just give it up?" He would also criticize Vitello in front of customers and other stylists. On April 10, 1992, Vitello filed an EEOC age discrimination complaint against Penney. The company received a copy of the complaint but took no steps to address her charges. Indeed, in its appellate brief, Penney proclaims that "[t]he [EEOC] charge did not alter" anything; "the evaluation period continued just as it had . . . ." Vitello testified that management's treatment of her even worsened after she filed the EEOC complaint.

In May 1992, assertedly because of "deterioration in . . . the styling salon," Woodruff sent an e-mail to Penney's labor attorney, inquiring whether he could "make a move on Jean by June 1" -- a month prior to the end of Vitello's probation period. The attorney advised Woodruff to wait until the end of that period and so he did. However, at the end of the probation on July 3, 1992, Woodruff informed Vitello that she would be removed from her supervisory salaried position and required to work as an ordinary stylist; she was to "go back to minimum wage and go behind a chair." Vitello told Woodruff that because she had followed his instructions "to give away over three-fourths of [her] clientele" in order to take on the greater supervisory responsibilities, she would not "be able to make it" on a stylist's wages. Woodruff insisted and Vitello felt like a "nobody" with "no self esteem," who was "shred of everything."

4

When Vitello returned to her office a few days after this meeting, she discovered that Woodruff had gone through her desk, taken everything she had, and put it in the trash. "[I]mportant color books, techniques books there, all of that were missing" and Vitello never was able to recover them. In addition, Woodruff had also turned her desk against the wall so that she could not get into the drawers. That day, Woodruff was taking a day off so Vitello went to see Visconti. She resigned, explaining to him:

> [T]he way I've been talked to, I've been badgered, I've been put down, I've been called a grandma, I've been told my customers are too old, how can I work under those kind of environments [sic]? And then the last straw was to go in and find Mr. Woodruff had went through my personal things and thrown them away.

Penney replaced Vitello with one stylist who remained a month, and then another. Both were in their early to mid-forties. Vitello subsequently worked part-time for herself, earning roughly $4,000 per year after expenses.

On May 18, 1993, Vitello filed this action. After several days of trial, a jury found that Penney discriminated against Vitello because of her age and caused her constructive discharge. The jury awarded Vitello $50,658 in back pay. Penney refused to consider re-employment of Vitello and so the court, after conducting an evidentiary hearing, awarded Vitello $124,557 in front pay damages. Penney appeals.[1]

---

[1] In ascertaining the facts, we had to look to the record and expected to rely on the joint appendix as setting forth the relevant portions of the record. After all, the joint appendix is supposed to assist an appellate court by being a compilation of those portions of the record necessary to decide the appeal; however, the appendix prepared in this case was far from helpful. Mechanically, it was a mess -- too many pages were put in a volume so that the volumes fell apart. Page numbers were largely unreadable so the court was reduced to counting each page of the appendix itself in order to find something referred to by joint appendix page in the briefs. The index to the appendix was useless, referring to "transcript of evidence" rather than identifying the trial testimony by witness.

5

II.

Penney's primary challenges on appeal are evidentiary ones. It maintains that the district court erred in denying its motion for a judgment as a matter of law with regard to the age discrimination and constructive discharge claims. We address each claim in turn. In doing so, we keep in mind that when reviewing a court's denial of a motion for judgment after a jury verdict, we must view the facts in the light most favorable to the non-moving party, drawing all inferences in that party's favor. See Martin v. Cavalier Hotel, 48 F.3d 1343, 1349-50 (4th Cir. 1995). We must affirm if there is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party," Wyatt v. Interstate & Ocean Transport Co., 623 F.2d 888, 891 (4th Cir. 1980), even if our own judgment of the evidence might be different. See Duke v. Uniroyal Inc., 928 F.2d 1413, 1417 (4th Cir. 1991).

A.

Under the ADEA, an eligible employee can seek redress for unfavorable employment action where the employee's age was a determining factor in the action. See Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992). Pursuant to a modified version of the proof scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973), an employee can establish a prima facie case of age discrimination by showing that: (1) she is a member of the protected age group (over 40 years old); (2) she suffered an adverse job action; (3) she was performing at a level that met her employer's legitimate expectations; and (4) she was replaced by someone of comparable

_____

The joint appendix totalled more than 1,000 pages and yet failed to contain the complaint and other crucial portions of the record. In short, the joint appendix was a disaster that utterly failed to comply with the letter or spirit of Fed. R. App. P. 30. Although counsel for appellant bears the principal responsibility for preparation of the joint appendix, in this circuit, appellee's counsel shares this responsibility. See 4th Cir. I.O.P.-30.2. We trust that counsel will never again file such a woefully inadequate joint appendix in this court.

qualifications who was substantially younger. See O'Connor v. Consolidated Coin Caterers Corp., 116 S. Ct. 1307 (1996) (modifying the fourth prong of the scheme); Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996). If an employee establishes a prima facie case, the burden of production then shifts to the defendant employer who can rebut the prima facie case by presenting evidence of legitimate, non-discriminatory reasons for its action. See Burns, 96 F.3d at 731 (quoting Tuck, 973 F.2d at 375). The employee must then show that the employer's proffered reason was not the "true reason for the employment decision." St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2747 (1993) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). The burden of persuasion remains with the employee at all times. See Burns, 96 F.3d at 731.

Penney does not assert that Vitello failed to make out a prima facie showing of age discrimination. The company, however, does maintain it rebutted that showing with a legitimate, non-discriminatory rationale for its employment decision -- declining economic performance in the salon and low morale of salon employees. We agree. Thus, the critical question is whether Vitello presented sufficient evidence so that the jury could conclude that Penney's rationale was a pretext for age discrimination.

We believe she did. Viewing the facts in the light most favorable to Vitello, as we must, a reasonable jury could conclude that Penney deprived Vitello of any authority to hire stylists during the period at issue, and thus, she was not directly responsible for low sales in the salon. Similarly, although Penney asserts that lack of staff in the salon resulted in part from Vitello's inability to get along with the stylists, a jury could credit the testimony of several stylists who testified that Vitello was a good manager who got along well with the other stylists. Further, the jury could also have considered the extensive testimony as to Woodruff's comments about Vitello's age and the age of her clientele. This testimony, damaging in itself, was substantiated by Woodruff's admission that he instructed Vitello "to attract a younger clientele." Based on this evidence, the jury could reasonably infer that Penney's alleged dissatisfaction with Vitello's performance was a pretext designed to insulate Penney from liability for discriminating against her because of her age.

7

B.

In order to recover on a constructive discharge claim, a plaintiff must show that her employer deliberately made her working conditions so intolerable that she was forced to resign. See Bristow v. Daily Press, Inc. 770 F.2d 1251, 1255 (4th Cir. 1985). Thus, a constructive discharge claim consists of two elements: (1) deliberateness of the employer's action and (2) intolerability of the working conditions. See Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1132 (4th Cir. 1995); Bristow, 770 F.2d at 1255.

Deliberateness exists when the actions of the employer were "intended by the employer as an effort to force the employee to quit." Martin, 48 F.3d at 1354. Such intent can be inferred from actual or circumstantial evidence. See Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir. 1984) (citing United States Postal Services v. Aikens, 460 U.S. 711 (1983)). Deliberateness is also shown if company personnel know of the untenable conditions, and take no steps to remedy the situation. Id.

The evidence was sufficient to support a conclusion that Penney's actions were deliberate. Although Penney argues its managers were merely attempting to enhance sales, a reasonable jury could conclude that the true -- albeit unstated -- purpose behind management's actions was to force Vitello to leave. Evidence of such deliberateness can be found in Woodruff's often-made comment that Vitello should just "give it up." Further, the three-hour meeting on March 13, 1992, at which Vitello was referred to as "grandma," and again asked several times whether she would "give it up," could be regarded as a deliberate attempt to upset Vitello so she would quit. The daily meetings with Woodruff during the probation period, at which similar comments were made, likewise evidence a deliberate effort to force Vitello to quit. Such evidence, coupled with testimony of Woodruff's other comments on how the salon looked like an "old folks home," and that the salon needed to hire "young, cute stylists," could imply a deliberate policy of pushing out an older supervisor in order to employ younger personnel to attract a younger clientele. Finally, even after Vitello formally placed Penney on notice of her charges of age discrimination by filing the EEOC claim, the company failed to take any measures to remedy the situation. We have repeatedly held that

8

while remedial measures can signal an employer's lack of deliberateness, see Holsey, 743 F.2d at 209, an employer's failure to remedy charges of discrimination provide evidence of an employer's deliberateness. See Amirmokri, 60 F.3d at 1133; Paroline v. Unisys Corp., 879 F.2d 100, 114 (4th Cir. 1989) (Wilkinson, J., dissenting), vacated in part, 900 F.2d 27 (1990) (en banc) (adopting Judge Wilkinson's dissent). Here, it is undisputed that Penney did not offer any response to Vitello's charges; the company did not even investigate them. A jury could certainly have concluded Penney acted deliberately.

Having determined that the evidence supports an inference of a deliberateness by Penney, we now turn to the question of whether Vitello's work environment was intolerable. Intolerability is evaluated under an objective standard of whether a reasonable person in the employee's position would have felt compelled to resign. See Bristow, 770 F.2d at 1255. Intolerable conditions are often associated with "egregious personal harassment." Diamond v. T. Rowe Price Assoc., Inc., 852 F. Supp. 372, 398 (D.Md. 1994). Demoting an employee can constitute an unreasonably harsh condition of employment, "especially where the demotion is essentially a career-ending action or a harbinger of dismissal." Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994). However, a "slight decrease in pay coupled with some loss of supervisory responsibilities" will not suffice to prove constructive discharge. Id. (quoting Jurgens v. EEOC, 903 F.2d 386, 392 (5th Cir. 1990)).

Stephens v. C.I.T. Group/Equipment Fin., Inc. , 955 F.2d 1023 (5th Cir. 1992), is instructive here. There, as in the instant case, an employer appealed a jury verdict for an employee on a claim of age discrimination and constructive discharge. The employer, like Penney, had demoted and reduced the employee's responsibilities. His salary was also cut by twenty percent. In evaluating the evidence, the Fifth Circuit concluded that:

> The combination of the demotion, the continuing limitations on his salary and responsibility, and [his boss's] repeatedly asking him whether he was going to quit his job, could make working conditions intolerable for a reasonable person in Stephens's position.

9

Id. at 1027. See also J.P. Stevens & Co. v. NLRB, 461 F.2d 490, 494 (4th Cir. 1972) (reducing employee's rate of pay with a discriminatory intent constitutes constructive discharge); Guthrie v. Tifco Indus., 941 F.2d 374, 377 (5th Cir. 1991) (demotion from vice president and general manager to senior buyer with substantial reduction in salary establishes prima facie case of constructive discharge); Zabielski v. Montgomery Ward & Co., 919 F.2d 1276, 1281 (7th Cir. 1990) (constructive discharge can be evidenced by demotion from managerial to sales job and accompanying loss of salary).

Similarly, a reasonable jury could find that Vitello's demotion and resulting substantial cut in pay, the haranguing about sales while limiting her ability to respond, the incessant meetings, and the derogatory age-related comments, had the cumulative effect of making Vitello's working conditions intolerable. Certainly, she faced "egregious personal harassment," Diamond, 852 F. Supp. at 398, in comments about her age, the age of her clientele, and her need to retire.

Indeed, the evidence of intolerable working conditions is even stronger here than in Stephens. There, the employer repeatedly asked the employee if he was "going to quit;" here, Penney management did not merely inquire as to whether Vitello would quit, but often suggested she do so. Of course, Penney asserts that its constant urgings that she "give it up" were simply meant to encourage Vitello to take a demotion, but a jury could have concluded that Penney was urging Vitello to "give up" employment with Penney. Moreover, the percentage wage reduction here was greater than that at issue in Stephens. And in the case at hand, there was evidence that management demoted Vitello to an hourly position after she had, at management's request, given away most of her customer base. In addition to losing all managerial responsibility, Vitello faced the loss of any chance of earning a salary approaching her previous wage; her treatment clearly goes beyond a "slight decrease in pay coupled with some loss of supervisory responsibilities," factors that we cautioned did not indicate constructive discharge in Carter, 33 F.3d at 459.

Finally, Vitello's physician testified at trial that while Vitello had previously been calm, pleasant, anxious to please, and cooperative, her work conditions caused acute stress resulting in a "total change [in] this individual's personality." On the basis of such evidence, a

10

reasonable jury could conclude that Vitello's working conditions were intolerable. In sum, the court did not err in denying Penney's motion for judgment.**2**

III.

Finally, Penney maintains that the court erred in awarding front pay, asserting the award is not supported by reliable evidence.

The equitable remedy of front pay is generally available when an employer terminates an employee unlawfully and reinstatement is not possible. See Duke, 928 F.2d at 1423. However, we will set aside such an award if we conclude that the district court abused its discretion, or that findings of fact on which the award is based are clearly erroneous. See Scarfo v. Cabletron Sys., Inc. , 54 F.3d 931, 954 (1st Cir. 1995). Penney stated that it would not reinstate Vitello. Thus, it fell to the trial court to determine what, if any, front pay Vitello merited.

Vitello presented sufficient evidence to support an award of front pay. An economist, Dr. Perry Woodside, estimated Vitello's lost earnings at $149,683, and her lost health benefits, pension and savings plans at $61,419. Based on Vitello's projected income level, Wood-

_____

**2** Penney also contends that the court erred in not granting its motion for a new trial, asserting that the verdict was against the weight of the evidence. A trial court's determination on whether to grant the motion falls within its sound discretion. See Poynter v. Ratcliff, 874 F.2d 219, 223 (4th Cir. 1989). We may overturn that decision only if the trial court abused its discretion. See Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1433 (4th Cir. 1985). Because, as explained in text, the verdict was not against the weight of the evidence, there was no abuse here. Penny's contention that the court wrongly refused to submit special interrogatories to the jury is similarly meritless. Like the new trial decision, whether to use special interrogatories is a matter within the discretion of the trial court, Deadwyler v. Volkswagen of America, Inc., 884 F.2d 779, 782 (4th Cir. 1989); its decision will only be reversed for abuse of discretion. See Norfolk S. R.R. Co. v. Davis Frozen Foods, Inc., 195 F.2d 662, 666 (4th Cir. 1952). Again there was no abuse of discretion-- the jury instructions adequately explained to the jury what it must find to return a verdict for the plaintiff.

11

side estimated that Vitello would make only $46,581 from the date the trial began until she would have retired in 2003 at the age of sixty-five. Discounting to the present value, Woodside fixed Vitello's total losses at $211,102. The district court rightly lowered that figure due to Vitello's failure to mitigate her losses. Drawing from the highest income presented by Penney's witnesses, the court estimated that Vitello could be making $17,000 a year if she were working full-time. It therefore subtracted that amount for each year from the front pay total.

All of the above calculations were within the court's discretion. The court was also justified in factoring in benefits, and discounting to present value. It would appear, however, that the calculations described by the trial court yield an award for front pay lower than $124,557. We, therefore, remand for a recalculation of this award.

IV.

For the reasons set forth above, the judgment is affirmed on all respects except that we remand for the court to recalculate the front pay award.

AFFIRMED AND REMANDED

12