**Ken ETEFIA, Plaintiff,**

v.

**EAST BALTIMORE COMMUNITY CORPORATION, Defendant.**

**No. Civ. L–95–1948.**

United States District Court, D. Maryland.

March 25, 1998.

752

Godson M. Nnaka, David G. Harlow, Baltimore, MD, for Plaintiff.

Paul D. Shelton, Paula J. McGill, Piper & Marbury, Baltimore, MD, for Defendant.

### MEMORANDUM OPINION

GAUVEY, United States Magistrate Judge.

Plaintiff, a former employee of the defendant East Baltimore Community Corporation ("East Baltimore"), brought this suit asserting multiple counts of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended and the state claim of intentional infliction of emotional distress. Plaintiff claims harassment based on national origin, failure to promote due to national origin and sex, and termination due to national origin. Pending before this Court is defendant's Motion for Summary Judgment of the federal and state claims.

### Factual Background[1]

East Baltimore hired plaintiff as a counselor on February 3, 1991. (Paper No. 48, Ex. 2). He interviewed for the position with Dr. Nancy Lowe–Connor ("Dr.Connor"), Muriel Brothers ("Ms.Brothers"), and Annie Dutton ("Ms.Dutton"), and was hired by Dr. Connor. (Paper 48, Ex. 1 no. 54–55). Plaintiff provided counseling to drug-addicted clients, including follow-up treatment. (Paper 48, Ex. 1 no. 65). During plaintiff's three-year tenure he worked under three different supervisors: Ms. Dutton, Genevieve McDade ("Ms. McDade") and George Stewart ("Mr.Stewart"), in that order.

Plaintiff asserts that Ms. Dutton was initially enthused with his hire because he was African. (Paper 48, Ex. 1, no. 77). At some point he believed that Ms. Dutton was forging client signatures, and confronted her with his belief. (Paper 48, Ex. 1, no. 82). Plaintiff claims his relationship soured with Ms. Dutton after this confrontation and he requested a transfer to Ms. McDade on August 26, 1991. (Paper 48, Ex. 1, no. 85). After working with Ms. McDade for a short time, plaintiff asserts that Ms. McDade stated she would "memo him right out of a job." (Paper 48, Ex. 1, no. 88). As to why she may have said this on the particular occasion, no explanation is given. He also testified that Ms. Brothers said around this time that he was "in for a lot of difficult time [sic] on the job." (Paper 48, Ex. 1, no. 92–93). While the staff perceived itself as "Afro-centric," plaintiff reports that Ms. McDade nonetheless made comments such as Africans "sold us into slavery." (Paper 48, Ex. 1, no. 92–93) and "Africans get kind of cocky with clients." (Paper 48, Ex. 1, no. 126). He also states that unidentified individuals said on more than one occasion that he "wasn't black." (Paper 48, Ex. 1, no. 102–103).

Plaintiff accuses Dr. Connor, the supervisor who both hired and fired him, of making the comments "this is a female-run program, we're smart and we're going to keep it that way," "Africans come over here and want to get these jobs" and "Africans are inferior to African–Americans" during his promotional interviews, sometime in January or February of 1994. (Paper 48, Ex. 1, no. 201). Plaintiff confronted Dr. Connor about her remarks but she denied them. (Paper No. 48, Ex. 1, no. 268–69). He heard someone, from a group of people that included Ms. Dutton and Ms. McDade, make the comment "look at the African" around the time he was transferred from Ms. Dutton to Ms. McDade. (Paper 48, Ex. 1 no. 203–204). The comment "look at Kunta Kinte" allegedly came from the lunch-

---

**1.** As the law requires, the Court has stated herein and considered the facts in the light most favorable to the plaintiff.

room when plaintiff walked by (Paper 48, Ex. 1, no. 206), and Mr. Stewart allegedly said "go home African, we don't want you here." (Paper 48, Ex. 1, no. 207). Ms. McDade or Ms. Dutton is reported to have said "go home witch doctor" towards the end of 1993. (Paper 48, Ex. 1, no. 208). He stated in his deposition that additional comments about his heritage "kept going on and on." (Paper 48, Ex. 1, no. 210).

Plaintiff believes that one unnamed billing clerk flirted with him; but otherwise admits that no one else behaved in a sexual way towards him, and that his female supervisors were "mother figures." (Paper at 48, Ex. 1, no. 120–122).

A number of memos document plaintiff's poor work performance. *See, e.g.*, Paper 48, Exs. 3 & 6. Plaintiff submitted forms late (Paper 48, Ex. 1, no. 80–81) and allegedly mistreated at least one client by ordering her out of his office, among other things. (Paper 48, Ex. 1, no. 170–72). Plaintiff maintains there is an inconsistency between his actual job evaluations and these memos. (Paper 48, Ex. 1, no. 94). He also maintains that the quality of his work did not decline from the time he was hired until the termination meeting of April 15, 1994. (Paper 48, Ex. 1, no. 181).

Plaintiff sought promotions to supervisory positions on three occasions. (Paper 48, Ex. 1, no. 177). He asserts that the first position was filled with someone with less education, contrary to policy, although he acknowledges the promoted individual possessed more seniority. (Paper 48, Ex. 1, no. 178). He also asserts that the second position he sought initially did not require a psychology degree (which he does not possess) until he expressed on interest in the position. (Paper 48, Ex. 1, no. 148). The person who ultimately filled the position possessed a psychology degree. Finally, he asserts the third position he sought was "frozen" and never filled. (Paper 48, Ex. 1, no 179).

Plaintiff was called to a meeting with Dr. Connor, Ms. Brothers and Mr. Stewart regarding his performance on April 15, 1994. (Paper 48, Ex. 1, no. 175). Dr. Connor terminated plaintiff on April 29, 1994 (Paper 48, Ex. 1, no. 154). Plaintiff filed a discrimination charge on June 24, 1994 with both the Equal Employment Opportunity Commission and the Maryland Commission on Human Relations. (Paper 48, Ex. 5).

After his termination, plaintiff visited a mental health professional once "on advice of a doctor," (Paper 48, Ex. 1, no. 189), worried about providing for his college-age son, (Paper 48, Ex. 1 no. 192), and worked various "menial" jobs for a year until securing permanent employment. (Paper 48, Ex. 1, no. 192–93).

### Argument

Defendant moves for summary judgment on all claims on several grounds. First, defendant asserts that any claims predating August 24, 1993 (which includes plaintiff's failure to promote claim) do not conform to the filing requirements of Title VII and are therefore untimely. Second, defendant argues that plaintiff cannot claim harassment because the alleged harassment plaintiff faced was neither sufficiently severe or pervasive to cause an intolerable working environment, nor was he was treated differently than other employees based on his sex or national origin. Third, as a matter of law, defendant asserts plaintiff's unlawful termination claim may not proceed because the plaintiff was terminated for documented poor work performance, an exercise of business judgment, not reviewable by this Court because he was terminated by the same person who hired him, disproving any discriminatory intent. Finally, defendant asserts that the facts do not establish the tort of intentional infliction of emotional distress under Maryland law.

Plaintiff, in his response to defendant's motion, first asserts that timeliness of claims is determined by the occurrence of the "last act" of an unlawful employment practice, and since the final act of discrimination occurred after August 23, 1993, all claims are timely. Second, plaintiff contends that the evidence of numerous derogatory remarks regarding his national origin demonstrated severe and pervasive harassment as a matter of law, and the discrimination evidenced by these remarks resulted in promotion denials and ultimate termination. Third, plaintiff asserts his case is distinguishable from cases that hold that discrimination is improbable when the

person who hires plaintiff also fires plaintiff; and that the allegations of poor work performance are pretextual and that there is a genuine issue of material fact as to whether his work performance or discriminatory animus led to his termination. Finally, plaintiff claims there is sufficient evidence in the record establishing all elements of Maryland's tort of intentional infliction of emotional distress.

### Standard of Review

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Thus, summary judgment is appropriate when it is clear that no genuine issue of material fact remains unresolved and an inquiry into the facts is unnecessary to clarify the application of the law. *Haavistola v. Community Fire Co. of Rising Sun,* 6 F.3d 211, 214 (4th Cir.1993).

The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Then the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a nonmoving party fails to make such showing, summary judgment is appropriate because the nonmoving party would be unable to establish an element of her claim at trial. *Id.*

To survive summary judgment, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial," and may not rest upon the "bald assertions of his pleadings." Fed.R.Civ.P. 56(e). Summary judgment is inappropriate if a reasonable jury could find for the nonmoving party at trial, *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and therefore, at the summary judgment stage, the court must view the evidence and inferences to be drawn from that evidence "in the light most favorable to

the non-moving party." The non-moving party is to "have the credibility of his evidence as forecast assumed, [and] all internal conflicts in it resolved favorably to him," *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990) (*quoting Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

### Analysis of Claims*Burdens of Proof

Viewing the facts in the light most favorably to the nonmoving party, the Court grants summary judgment for defendant on the state tort of intentional infliction of emotional distress for the reasons set forth below. The Court denies summary judgment on the three discrimination claims.

## I. TIMELINESS OF CLAIMS

**The Termination and Harassment Claims are within Limitations Period; All But One Promotion Claim Falls Within Limitations Period**

A plaintiff may proceed under Title VII in federal district court only after he exhausts the administrative review requirements of the statute. 42 U.S.C. § 2000e–5; *Marshburn v. Postmaster General,* 678 F.Supp. 1182 (D.Md.), *aff'd,* 861 F.2d 265 (4th Cir. 1988). The plaintiff must file a timely charge with the Equal Employment Opportunity Commission ("EEOC"). *Id.* In instances where the charge is filed with a State or local agency and the State or local agency does not terminate proceedings under State or local law, the prospective plaintiff must file his EEOC charge within 300 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–5(e)(1); *United Air Lines v. Evans,* 431 U.S. 553, 555, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Doski v. M. Goldseker Co.,* 539 F.2d 1326, 1329 (4th Cir.1976).

Plaintiff filed a discrimination charge on June 24, 1994 with both the Equal Employment Opportunity Commission and the Maryland Commission on Human Relations. Nothing in the record indicates the Maryland Commission on Human Relations terminated a proceeding based on plaintiff's claims. Therefore, the 300–day limit for timely filing applies to plaintiff, and any claims which

occurred before August 24, 1993 are time-barred.

Plaintiff's termination occurred April 29, 1994 (Paper 48, Ex. 1, no. 154). Therefore, his termination claim is unquestionably within the 300 day limitations period. This leaves the question as to whether his promotion and harassment claims are time-barred.

Defendant argues that discrete acts of alleged discrimination should be treated separately, and therefore any alleged acts of discrimination which occurred outside the 300-day window should not be examined by the court. In particular, defendant avers that the first promotion plaintiff sought was in 1992 and is therefore outside the limitations period. Similarly, the defendant asserts discriminatory comments made outside the limitations period are not subject to court review as part of the harassment claim.

The Fourth Circuit has long recognized that incidents outside of the statutory window are not time-barred if they relate to a "timely incident as a 'series of separate but related acts' amounting to a continuing violation." *Beall v. Abbott Laboratories* 130 F.3d 614, 620 (4th Cir.1997) *citing Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir. 1980) (per curiam).

However, unlike pattern and practice cases or harassment claims, the fact that a person continues to seek promotion does not mean that a continuing violation is present. *See International Union of Electrical, Radio & Machine Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). As the court stated in *Soble v. University of Maryland*, 572 F.Supp. 1509, 1516 (D.Md.1983): "To hold otherwise would ensure that every claim of denial of promotion to a higher paying position would toll the period to file one's charge as long as one merely continued to be employed in the lower position of employment." Unlike harassment claims, which may require looking at behavior outside the limitations period in order to determine whether harassment is pervasive, attempts at promotion are usually viewed as discrete employment acts. *See Smallwood v. United Air Lines, Inc.*, 661 F.2d 303, 309 (4th Cir.1981) (referring to the "discrete act" as the time from which the limitations period is determined).

As noted in the section below addressing the harassment claim, the alleged comments made prior to the limitations period are an appropriate matter for judicial review based on the aforementioned "continuing violation" theory.

## II. HOSTILE WORK ENVIRONMENT[2]

**Genuine issues of fact remain as to whether ongoing offensive comments by co-workers and supervisors were sufficiently pervasive to create a hostile work environment and whether defendant knew or should have known about such harassment.**

The Court denies summary judgment for defendant on Count I, the harassment claim, because, viewing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the harassment by plaintiff's co-workers and supervisors created a hostile work environment in violation of Title VII. Additionally, a reasonable jury could find that the defendant knew or should have known of such harassment and failed to take action.

To support a claim of national origin harassment, Mr. Etefia must show (1) that the acts were severe or pervasive enough to

---

2. It is unclear whether plaintiff is alleging sexual harassment as well as national origin harassment. Defendant assumes plaintiff claims sex harassment in addition to national origin harassment, probably because plaintiff's "Allegations of Fact Common to All Counts" states at paragraph 12: "The plaintiff was subjected to discrimination in the forms of harassment, failure to promote, and termination as a direct result of his national origin and/or his gender." However, plaintiff does not list sex harassment among his counts. He does, however, state in his opposition to defendant's motion that he was the target of gender or national origin harassment, but he then proceeds to treat the claim as a national origin harassment claim. If plaintiff meant to claim sexual harassment, this claim would fail to survive summary judgment. Plaintiff alleges that only one derogatory comment was made regarding his gender during his employment, and the only conduct "sexual" in nature to which he points is mild flirting. Furthermore, the flirting he experienced was well outside the 300-day statute of limitation.

**758**

create a hostile working environment based on his national origin[3] and (2) that some basis exists to impute liability to his employer. *Amirmokri v. Baltimore Gas and Electric Company*, 60 F.3d 1126, 1130 (4th Cir. 1995).

### A. Severity or Pervasiveness

 To succeed on his claim, plaintiff must establish that he perceived, and a reasonable person would perceive, the harassment to be sufficiently severe or pervasive that it created an abusive work environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In analyzing whether the harassment was sufficiently severe or pervasive, the Supreme Court has instructed the lower courts to look at the "totality of the circumstances," including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

As for the subjective requirement, Plaintiff has proffered sufficient evidence for a jury to find he perceived the work environment abusive because of either the severity or pervasiveness of the harassment. Mr. Etefia has proffered a psychiatric report stating that the events at work had caused him to feel "trampled upon," "abused," and "depressed." (Paper No. 50, Ex. N at 4).

 Whether the harassment was objectively severe or pervasive is a closer question. Plaintiff has identified at least 10 remarks spoken over a period of approximately three years. (Paper 48, Ex. 1 at 92–93, 102–103, 126, 201–204, 206, 207, 208, 210). These remarks, among others, refer to Mr. Etefia as "Kunta Kinte" and a "witch doctor," chide Mr. Etefia for not being black enough and for living in treetops, and include taunts of "go home, African." Plaintiff's deposition indicates that the comments were repeated throughout Mr. Etefia's employment, as he states the remarks "kept going on and on and on."[4] (Id. at 210).

 Although offensive and certainly not condoned by this Court, none of the above comments rises to the level of "severe." They fall short of vulgarity or recognized epithets. The remarks were not physically threatening. Although the alleged acts of harassment are not "severe" as defined by case law, plaintiff has produced sufficient evidence that a jury might find that the harassment was pervasive. As this Court noted in *Glorioso v. Aireco Supply Inc.*, 1995 WL 442203, *3 (D.Md.1995), "the required showing of severity ... of the harassing conduct varies inversely with the pervasiveness ... of the conduct." That is, a few severe incidents can create a hostile work environment, while lesser acts can also create such an environment if greater in number.

The Supreme Court has clearly stated that a "mere utterance of an ... epithet which engenders offensive feelings" does not create a hostile work environment under Title VII. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). However, the Supreme Court has not further marked the boundary of what is actionable. Indeed, there is no magic number of incidents an employee must allege. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir.1991).

---

3. In *Amirmokri*, the Court switches between "severe and pervasive" and "severe or pervasive." All prior Fourth Circuit opinions present the test as "severe or pervasive," in keeping with the Supreme Court language in *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) and *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (When the workplace is permeated with "discriminatory intimidation, ridicule, and insult .. that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ... Title VII is violated."). Accordingly, the Court considers whether plaintiff has sufficient evidence to show that the acts alleged were either severe or pervasive.

4. At least some of comments occurred within the 300–day actionable period explained in Section I. (Paper No. 48, Ex. 1 at 202, 208). Therefore, plaintiff may use evidence of pre-limitations comments to support his claim under a continuing violation theory. *See Lockett v. West*, 914 F.Supp. 1229, 1235 (D.Md.1995) (finding that pre-limitations acts are admissible to support a hostile work environment claim as long as the alleged acts are not isolated incidents and as long as at least one violation occurred within the limitations period).

Mr. Etefia here has alleged not a single offensive utterance, but rather a series of offensive comments by, among others, Mr. Stewart, Ms. McDade, and Dr. Connor. All of these individuals held supervisory positions above the plaintiff—a fact that could reasonably ave intensified the effect of the comments they made. (Paper No. 48, Ex. 2 at 207, 208, 201). Additionally, if believed, the work environment was also permeated by threats of job loss directed at him because of his African origin. His supervisor at one point said she would memo [him] "right out of work." (Paper 48, Ex. 1 at 88). Mr. Etefia states that numerous negative memos throughout his employment falsely portrayed his work performance and were written to create cause for his termination. (Id. at 82, 110–111; Paper No. 50, Ex. F). Thus, although the latter hostilities, unlike the offensive remarks, are not clearly linked to Mr. Etefia's African origin, they can contribute to a hostile atmosphere if based on his national origin. *See Amirmokri v. Baltimore Gas and Electric Co.*, 60 F.3d 1126, 1131 (4th Cir.1995) (harassment could be severe and pervasive where co-workers called plaintiff "the local terrorist" and "camel jockey" and where a supervisor tried to embarrass plaintiff by giving him impossible tasks and then saying in front of co-workers that plaintiff did not know what he was doing).

Plaintiff does not allege that he faced the alleged comments on an "almost daily" basis as did the plaintiff in *Amirmokri;* nor does Mr. Etefia allege that the comments amounted to a "steady barrage of opprobrious" remarks. *See Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981). However, he did testify, albeit somewhat vaguely, that comments about his heritage "kept going on and on." In any event, the comments at East Baltimore amounted to more than "a mere utterance" or isolated incidents. Looking at the totality of the circumstances, the Court declines to find that as a matter of law the comments at issue, along with the other actions by Mr. Etefia's supervisors, are insuf-

ficient to support a claim. Therefore, as the question of pervasiveness is "quintessentially a question of fact," *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir.1994), the Court leaves that question to the jury.

## B. Employer Liability

To survive summary judgment on the national origin harassment claim, Mr. Etefia next must establish that some basis exists to impute liability to his employer. *Amirmokri*, 60 F.3d at 1130. The employer can face liability for either its own harassing conduct or for its failure to act in the face of such conduct. In the Fourth Circuit, harassing conduct of a supervisor is deemed to be the conduct of the employer only if the harassing supervisor is a representative of the company, such as a proprietor, partner, or corporate officer. *Andrade v. Mayfair Management, Inc.*, 88 F.3d 258, 261 (4th Cir. 1996).[5] Otherwise, the employer is liable only if it "knew or should have known [of the harassing conduct] and failed to take prompt and adequate remedial action." *Id.* at 262.

Plaintiff here accuses his supervisors Ms. McDade and Mr. Stewart, and their supervisor, Dr. Connor, and perhaps others, of perpetrating the harassment at issue. Because none of the alleged harassers are representatives of East Baltimore, under *Andrade* their actions cannot be directly imputed as the defendant's actions.

Consequently, Mr. Etefia can establish East Baltimore's liability only by showing that East Baltimore had actual or constructive notice of the alleged harassment and failed to remedy it. Mr. Etefia has proffered no direct evidence that any representative of East Baltimore knew of the harassment. That is, he has offered no evidence that any representative actually witnessed the harassment or that he notified any representatives of the harassment.

5. The Fourth Circuit declines to follow EEOC regulations that provide that an employer is responsible for harassing conduct of its supervisory employees "regardless of whether the employer knew or should have known" of such conduct. 29 C.F.R. § 1606.8(c). The Fourth Circuit instead has found that, under general agency principles, illegal harassment is illegitimate corporate activity, beyond the scope of a supervisor's employment, and therefore cannot be directly imputed to the employer. *See Andrade v. Mayfair Management, Inc.*, 88 F.3d 258, 261–62 (4th Cir. 1996).

As defendant points out, Mr. Etefia knew that Dr. Marie Washington was the president of East Baltimore, and although Mr. Etefia passed Dr. Washington in the halls on occasion, he never complained to her of the alleged harassment. (Paper No. 58 at 18, Paper No. 48, Ex. 1 at 257, 245). Thus, defendant's argument is similar to the Court's reasoning in *Andrade*—that plaintiff knew the officer to whom the harasser reported and knew that she should have complained to such officer. *Andrade*, 88 F.3d at 261. However, the Court declines to interpret *Andrade* to say that when an employee has access to the president or a corporate officer, the employee must report the harassment directly to such individual in order to establish the employer's liability. Rather, in *Andrade*, the employee failed to report her supervisor's harassment to anyone, and thus no evidence supported the employee's contention that the employer knew or should have known. *Id.* at 261.

The Fourth Circuit case law clearly requires less than actual notice to the president of corporate officer. In *Amirmokri*, for example, the Fourth Circuit noted that a plaintiff's complaint to the general supervisor, who had authority over the harasser, gave the employer constructive notice. *Amirmokri*, 60 F.3d at 1131 n. 1. And in *Ward v. Johns Hopkins*, 861 F.Supp. 367, 377 (D.Md. 1994), this Court found that an employee's complaints to her immediate supervisors, along with complaints by co-workers to their immediate supervisors about the same alleged harasser, created a jury question as to whether the university should have known about the unlawful conduct.

Like the plaintiffs in *Amirmokri* and *Ward*, Mr. Etefia has presented some evidence from which a reasonable jury could find that word of the harassment reached, or should have reached, the defendant. In his deposition, Mr. Etefia states that when the comments "continued to a point where [they] could no longer be tolerated, I took notice of those things and even went to the medical director." (Paper No. 48, Ex. 1 at 210). Mr. Etefia stated that the medical director, Dr. Kofi Shaw–Taylor, who is apparently equal in rank to Dr. Connor, directed him to the personnel director. (Id. at 213, 211). Earlier in his deposition, Mr. Etefia stated that he

had tried to talk with the personnel director, and such was "to no avail .... [t]hey kept giving me the runaround." (Id. at 85). Mr. Etefia also wrote a letter to Dr. Connor in August 1993 complaining about Ms. McDade and Ms. Brothers. Although the letter does not mention any derogatory comments by the two women, Mr. Etefia does call their actions "discriminatory" and "calculated to ... jeopardize my employment especially considering ... that I am the only lower-level foreign staff on this program." (Paper No. 50, Ex. F at 5). Thus, although the evidence is far from overwhelming, the attempts to complain to the medical director, Dr. Connor, and the personnel director, especially, weigh in plaintiff's favor. The medical director, although not Mr. Etefia's supervisor, is apparently ranked highly within the organization, as is Dr. Connor. Additionally, the personnel director is the logical conduit to convey harassment complaints to employer. *See Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir.1997) (finding that notice was sufficient where victims, in the absence of a written grievance policy, "logically concluded that it made sense to complain to [the] warehouse manager ... who both supervised ... the primary harasser and reported directly to the President"). Therefore, the Court finds that there exists evidence for the jury to weigh and consider whether East Baltimore "knew or should have known" of the allegedly hostile work environment. Additionally, no evidence in the record indicates that any remedial action was taken. Accordingly, the Court finds that plaintiff's hostile work environment claim survives summary judgment as to the issue of employer liability.

## III. UNLAWFUL TERMINATION AND FAILURE TO PROMOTE

### A. Plaintiff provides sufficient evidence to survive summary judgment on his termination claim based either on a McDonnell Douglas or Price Waterhouse analysis.

The plaintiff bears the initial burden of establishing a prima facie case of unlawful termination, either through establishing pretextual motives by the employer using *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) or by establishing sufficient direct evidence to establish mixed-motive employing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 259–60, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). While the parties may suggest a particular proof scheme, the court may ultimately decide which is appropriate. *See Fuller v. Phipps,* 67 F.3d 1137, 1143 n. 2 (4th Cir.1995), (noting that the court may determine if a case is "mixed-motive" or "pretext" after reviewing the evidence).

■■■■ The Court determines the plaintiff has met his burden at this stage of the proceedings, under either evidentiary scheme for his claim of national origin discrimination, and therefore defendant's summary judgment request is denied.[6]

In order to establish a prima facie case of unlawful termination under *McDonnell Douglas,* plaintiff must prove (1) he is a member of a protected class; (2) that he was qualified for his job and his job performance was satisfactory; (3) that, in spite of his qualifications and performance, he was fired; and (4) that the position remained open to similarly qualified applicants after his dismissal. *Karpel v. Inova,* 134 F.3d 1222, 1998 WL 25699, *4 (4th Cir.1998) *citing Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989).

Once a prima facie case is established, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant comes forward with this evidence, the plaintiff may demonstrate the reason is pretextual.[7] *Id.* In order to prevail, the plaintiff need not necessarily disprove the defendant's reason, but must demonstrate that unlawful discrimination was a "motivating factor" in the employment action in dispute. *See* 42 U.S.C. § 2000e–2(m) (Section 107): "Except as otherwise provided in this title [42 U.S.C. §§ 2000e et seq.], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any em-

**6.** Defendant notes that there is a line of decisions, including Fourth Circuit decisions, stating that it is improbable that discriminatory animus is at play when the same person hires and fires the plaintiff, and the plaintiff is obviously a member of the protected class at issue at both the time he is hired and fired. *See e.g. Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991). However, none of these cases involve direct evidence of any kind. And they most certainly do not involve accusations that the person who hired and fired plaintiff made discriminatory comments about his protected class, as in the case at bar. Furthermore, the *Proud* court also states that lack of discriminatory animus may only be inferred in a termination case if the plaintiff was employed for a "relatively short time span." "Therefore, in cases where the hirer and the firer are the same individual and *the termination of employment occurs within a relatively short time span following the hiring,* a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud* at 797 (emphasis added). Significantly, Proud was employed less than six months; Etefia was employed about three years.

**7.** Defendant maintains that plaintiff was terminated because of poor work performance. A number of memos document complaints by his supervisors, at least one client and an outside individual who represented the company providing health insurance to East Baltimore's clients.

Therefore, defendant maintains that if the Court does not grant summary judgement, it is substituting its "business judgment" for the defendant's business judgment. Defendant then cites a number of cases—all but one from the Fourth Circuit or District of Maryland—for this proposition. Excerpts such as the following are offered to the Court: "Plaintiff's subjective beliefs that she has been a victim of discrimination … are insufficient … to carry the day in an employment discrimination case," *Townes v. Giant Food,* 53 Fair Empl.Prac.Cas. 988, 990 (D.Md. 1990), *aff'd,* 921 F.2d 272 (4th Cir.1990); the civil rights statutes are not vehicles by which any protected employee "may have a federal judge and jury review the merits of his or her job performance." *Leonard v. Gould, Inc.,* 744 F.Supp. 1398, 1399 (D.Md.) *aff'd,* 914 F.2d 248 (4th Cir.1990). However, none of these cases involved a plaintiff with direct evidence of any kind, much less allegations regarding the plaintiff's protected class. Rather, in every single case cited, the only evidence offered was circumstantial in nature. That is to say, the defendants in these cases offered legitimate, nondiscriminatory reasons ("business judgment" as framed by defendant) for the employment actions at issue, and the plaintiffs were all unable to demonstrate that the defendants' proffered explanations were pretextual. Simply put, judges and juries indeed may evaluate the "business judgements" of an employer if they are tainted by discrimination contrary to Title VII.

ployment practice, even though other factors also motivated the practice."

Demonstration of discriminatory motivating factors may turn the case into a "mixed motive case." To prevail in a mixed-motive case, plaintiff must demonstrate by a preponderance of the evidence that the employer's motive to discriminate was a substantial factor in the adverse personnel action against the plaintiff. Once the plaintiff provides sufficiently probative evidence to carry its burden, the burden of persuasion then shifts to the employer to show by a preponderance of the evidence that, in the absence of the unlawful motive, it would have reached the same result. *White v. Federal Express Corporation, overruled on other grounds,* 939 F.2d 157, 160 (4th Cir.1991), citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 259–60, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (White, J., concurring).

In *Fuller v. Phipps,* 67 F.3d 1137 (4th Cir.1995), the court acknowledged that the Civil Rights Act of 1991 modifies *Price Waterhouse* in such a way that "employers now violate the Act when race plays an actual role in an employment decision, regardless of other considerations that may independently explain the outcome." *Id., citing Preston v. Virginia ex. Rel. New River Community College,* 31 F.3d 203, 207 (4th Cir.1994). Following Justice O'Connor's lead, the court stated, however, that for Section 107 to apply, a plaintiff must make out a mixed-motive case by providing "direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion." *Id.* at 1142, *citing* Justice O'Connor's *Price Waterhouse* concurrence, 490 U.S. at 277, 109 S.Ct. 1775.

After explaining that "not all evidence that is probative of discrimination will entitle the plaintiff to a [mixed-motive] charge," *Fuller* at 1142, *quoting Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 181 (2d Cir.1992), the appellate court stated that for Section 107 to apply there must be "evidence of conduct or statements that both reflect the alleged discriminatory attitude *and* that bear directly on the contested employment decision." *Fuller* at 1142, *citing Ostrowski,* 968 F.2d at 182 (emphasis added); *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir.1995); *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993). The *Fuller* court further explained that whether a case is classified as "mixed motive" or not does not depend on whether single or multiple motives inspired an employment decision, but rather, on the strength of evidence establishing discrimination. *Id.* at 1143, n. 3.

In sum, the evidence in this case turns on whether the plaintiff failed to satisfactorily perform his job or whether the documentation of his job difficulties were part of a plan to terminate him, a plan which in turn was based on discrimination due to national origin.[8]

If the defendant is correct that unlawful discrimination did not play a role in the plaintiff's termination, than plaintiff would fail to meet the second prong of *McDonnell Douglas* and the defendant would simultaneously provide its legitimate, nondiscriminatory reason for plaintiff's termination. However, viewing plaintiff's evidence in the light most favorable to his case and resolving all internal conflicts favorably to him as the summary judgment standard requires, the Court concludes the plaintiff brings into question whether the defendant's reason for terminating him is pretextual and thereby also puts into question whether the plaintiff does or does not meet the second prong of the *McDonnell Douglas* test.

East Baltimore asserts that its legitimate, nondiscriminatory reason for its termination of Etefia is his inability to perform his job. Plaintiff rebuts by asserting that his supervisors' assessment of his work was tainted by their discrimination.[9] Both parties present evidence buttressing their assertion of the facts: among other things, defendant pos-

---

8. Plaintiff does not assert in his complaint that gender played a role in his termination.

9. Defendant also attempts to argue that all parties are of the same national origin, and therefore plaintiff does not even satisfy the first prong of McDonnell Douglas. The Court finds this argument unpersuasive. while the ancestors of the staff of the defendant may have originated in Africa, they are also culturally American. Plaintiff, on the other hand, was born in Africa and is culturally African.

sesses the unflattering memos and plaintiff cites to discriminatory comments he asserts can be corroborated by other witnesses. A jury will need to consider and weigh this and other evidence.

The Court also concludes that viewed through the *Price Waterhouse* lens, plaintiff survives summary judgement. In making this determination, the Court must keep in mind that a jury will be asked to determine whether: (1) there is evidence that decision makers "placed substantial negative reliance on illegitimate criterion" and (2) whether the conduct and statements "reflect the alleged discriminatory attitude" and also bore "directly on the contested employment decision." *Fuller* at 1142. The fact that discriminatory comments were allegedly made by the supervisor who fired the plaintiff, that the comments included "go home to Africa," and that a supervisor allegedly said she would "memo" plaintiff out of a job could all establish a "discriminatory attitude" that bore on the termination decision.

Whether the evidence is sufficient to prove that the defendant placed "substantial" negative reliance on plaintiff's national origin when making the decision to terminate is a quintessential question of fact, one which must be left to the trier of fact, the jury.

**B. Plaintiff provides sufficient evidence to survive summary judgment on his promotion claim based on the McDonnell Douglas or Price Waterhouse analysis based on national origin discrimination, not gender discrimination.**

The burdens of proof used to examined the remaining two promotion claims are essentially the same as in a termination claim. The initial *McDonnell Douglas* four prongs in a situation involving a specific vacancy, however, is stated slightly differently than for a termination case:

(1) plaintiff is a member of a protected group;

(2) plaintiff applies for the position in question;

(3) plaintiff was qualified for the position; and

(4) plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.

*McNairn v. Sullivan,* 929 F.2d 974 (4th Cir. 1991).

For national origin discrimination, plaintiff meets the first prong, and the third prong is in question like the second prong of the termination claim. Whether the plaintiff was qualified for the promotional positions he sought is in question because the plaintiff provides sufficient evidence to meet the fourth prong of the test: plaintiff provides evidence giving rise to an inference that his skills and ability to perform his job or any job for the organization were tainted by national origin discrimination. In addition to comments such as "go home African," plaintiff also asserts that Dr. Connor made the comment "you Africans, you come over here and want to get these jobs, you're living off the blood and sweat of African–Americans" in his second promotional interview,[10] (Paper 48, Ex. 1, no. 202).

Also giving rise to an inference of discrimination is the fact that the second position for which plaintiff alleged he was qualified to seek was never posted. (Paper 48, Ex. 1, no. 149). *See Brown v. Gaston County Dyeing Machine Company,* 457 F.2d 1377, 1383 (4th Cir.1972) (failure to post notices of job vacancies were badges of discrimination that serves to corroborate bias). Furthermore, plaintiff asserts that the qualifications for the second position changed. He asserts no psychology degree was initially required, and that the defendant changed the criteria to add a psychology degree specifically to shut him out of the position. (Paper 48, Ex. 1, no. 148). Finally, the third position was inexplicably "frozen" and never filled after plaintiff applied for it. (Paper 48, Ex. 1, no. 179).

In establishing the four prongs, plaintiff also rebuts defendant's legitimate, nondiscriminatory reasons for not promoting him: that he didn't possess the preferred skills and he wasn't qualified. Plaintiff questions

---

**10.** Additionally, the discriminatory comments also may be employed in the *Price Waterhouse* analysis: they tend to reflect a "discriminatory attitude" and also bore "directly on the contested employment decision."

which criteria were actually used by defendant, and he questions whether the evaluation of his ability to assume a supervisory position was tainted by discrimination.

Plaintiff, however, fails to satisfy the four prongs of the test for a claim of discrimination in promotion based on gender. As stated earlier, one of the two positions Mr. Etefia sought and which is within the limitations period was frozen, and the second was filled by a man. Given that a woman was not promoted over Mr. Etefia for either position, he fails the fourth prong of the *McDonnell Douglas* promotion test. Dr. Connor allegedly made one comment about keeping East Baltimore a "female-run" organization. However, considering that one of the two promotions within the limitations period was filled by a man, there is not sufficient evidence to give rise to an inference of discrimination, as required by the fourth prong. Additionally, it appears that the alleged sex-based comment may have been made within the context of Dr. Connor explaining that the second promotion went to George Stewart, further diminishing its importance and rendering it a mere stray remark. (*See* Paper 48, Ex. 1 at no. 201 and Paper 59, no. 2.)

## IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Plaintiff fails to provide evidence of all elements of the claim .**

Defendant avers that the plaintiff has failed to make a prima facie showing of intentional infliction of emotional distress because the plaintiff's allegations are merely conclusory and do not rise to the level of outrageousness necessary to satisfy this element of the tort. The Court agrees and grants summary judgment of plaintiff's intentional infliction of emotional distress claim.

To state a claim of intentional infliction of emotional distress, (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191 (1992). Maryland has determined that in a claim for intentional infliction

of emotional distress, "recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves." *Id.* The highest court of Maryland stated in *Batson* that it has upheld such a claim only very rarely and when the case involved "truly egregious acts." *Id.* Following the mandate of the Maryland courts, this Court finds that the defendant's conduct did not rise to the level of being extreme or outrageous under Maryland law.

It is the court that determines in the first instance whether the conduct is extreme or outrageous. *Id.* at 734, 602 A.2d 1191; *Childers*, 881 F.2d at 1266. For conduct to be outrageous, it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 733, 602 A.2d 1191. A claim exists "only if the 'average member of the community must regard defendant's conduct . . . as being a complete denial of the plaintiff's dignity as a person.'" *Leese*, 64 Md. App. at 469–70, 497 A.2d 159. Even though the plaintiff refers to the alleged actions as "extreme" and "outrageous," the Court finds no evidence to support such a contention, noting that in *Beye*, the court found that the employer's conduct was not extreme or outrageous when it repeatedly harassed the employee, failed to promote him, *and deceived him into resigning*. Discussed in *Leese*, 64 Md.App. at 470, 497 A.2d 159 (emphasis added). Clearly this standard does not permit the Court to find the presence of the second element of the claim based on plaintiff's assertion that another colleague cried and allegedly resigned in protest because of defendant's alleged behavior toward plaintiff. (Paper 50, no. 22).

To meet the final prong, the plaintiff must show that he suffered "a severely disabling emotional response so acute that no reasonable man could be expected to endure it." *Leese*, 64 Md.App. at 471, 497 A.2d 159. Where the plaintiff alleges only "physical pain, emotional suffering and great mental anguish," that is insufficient to establish a claim for intentional infliction of emotional distress. *Id.* at 472, 497 A.2d 159. A survey

of Maryland law suggests that, unless the plaintiff is precluded from performing daily activities such as working or doing household chores as a result of his severe emotional distress, the plaintiff typically cannot meet the fourth prong of the prima facie claim. *See Norris v. St. Joseph Hospital, Inc.* 1992 WL 531464 (D.Md.1992).[11] There is insufficient evidence in the record to demonstrate that the plaintiff was debilitated by emotional anguish to the point that he could not work, look for work, or perform his daily activities. Plaintiff said he began working after his termination (Paper 48, Ex. 1, no. 193)—this is evidence he was not so debilitated with grief that he was unable to function. While plaintiff may have worried about his finances, (Paper 48, Ex. 1 no. 192), such worries do not rise to the level necessary for this prong of the prima facie claim. The plaintiff, therefore, fails to meet at least the second and fourth prima facie factors, making it unnecessary for the Court to conduct further inquiry as to this Count and the motion is denied as to this claim.

### Conclusion

Accordingly, for the reasons stated above, the Court hereby grants defendant's motion for summary judgment as to the intentional infliction of emotional harm claim and all claims based on gender discrimination. The Court denies the defendant's motion for summary judgment as to the claims of unlawful termination, failure to promote and hostile work environment based on national origin.

A separate Order will be entered.

11. This case reviews five cases from Maryland state appellate courts.